Mark DIAK, Plaintiff–Appellant,

v.

DWYER, COSTELLO & KNOX, P.C., Terrance D. Knox, and John E. Dwyer, Defendants–Appellees.

No. 93–2960.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1994.

Decided Aug. 26, 1994.

John J. Kurowski (argued), Charles W. Courtney, Jr., Kurowski & Courtney, Swansea, IL, for plaintiff-appellant.

Robert T. Mills (argued), Jon M. Moyers, Timothy F. Noekler, Cathryn A. Conrad, Coburn & Croft, St. Louis, MO, for defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and NORGLE, District Judge.[*]

CUDAHY, Circuit Judge.

Mark Diak, an accountant, was hired by the accounting firm Dwyer, Costello & Knox, P.C. (DCK) in late 1973. After retiring in 1985, he discovered that DCK had paid pension benefits to some retired employees. Believing he had been wrongfully denied pension benefits, Diak sued DCK and officers John Dwyer and Terrance Knox for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA). The district court granted summary judgment for DCK, finding that DCK had not established a pension plan. Diak appeals, arguing that there was a "plan" under which he is entitled to benefits. Diak also argues that the district court abused its discretion when it denied his motion to compel discovery. We affirm.

[*] The Honorable Charles R. Norgle, Sr., of the United States District Court for the Northern District of Illinois, is sitting by designation.

## I.

DCK began as a partnership (DCK Partnership) with Dwyer and his son-in-law Knox as partners. DCK incorporated in 1982 and Dwyer and Knox became officers and shareholders. In January 1984, Diak also became a shareholder and officer. In 1985, at the age of 32, Diak resigned from DCK and started a competing accounting firm.

Diak was never told that DCK had a pension plan. But in 1989, Diak learned that four retirees had received pension payments. In 1973, Abraham Schaffer retired from employment with DCK after 16 years of service as an accountant. Since his retirement, DCK has paid Schaffer $75/month as well as providing medical and dental coverage. In 1974, Della Chellist retired after 36 years of service as a secretary. Chellist has received $100/month and payment of medical and dental insurance. In June 1981, Mary Wiley retired after 5 years of service; DCK continued to pay her medical and dental insurance.

John Dwyer retired in 1981 after 55 years of service. After retirement Dwyer remained active in the firm on a limited basis, but received no salary. In 1983, Dwyer began to receive $1000/month from DCK; the amount increased so that by 1989 he was receiving $30,000/year. In his deposition, Dwyer testified that he and Knox established the amount of his pension, which in 1991 amounted to $30,000. When asked about the criteria for determining a pension amount, Dwyer replied:

> The only guideline we have dealing with pensions is if somebody is with our firm, had been with our firm for twenty years and was 65, they got a pension, and a health and welfare that was established. We just established it. There was no particular plan. It was just established—if somebody had been with us all that time, they were entitled to something from us, no written plan. . . .

Dwyer reported the payments on his income tax returns as pension payments. Dwyer also testified that he was familiar with pen-

sion plans and ERISA, having advised pension funds as clients and served as the executive director of the Central States Teamsters Pension Fund in 1978/1979.

According to DCK, the pension payments were not made pursuant to a "pension plan" but were individual contracts executed upon each person's retirement. Of the approximately 25 employees who left DCK after 1970, only the above-named four employees received any post-employment benefits. Moreover, DCK maintains that these contracts were made only with individuals who reached retirement age and retired from the *partnership;* no benefits have ever been paid to employees of the corporation DCK.

All of the pensions were paid out of DCK's general revenues. From 1984 until 1990, Schaffer, Chellist and Dwyer received from DCK an annual Form W–P2, and its successor, Form 1099–R. DCK's corporate income tax returns included deductions for pension contributions in each year from 1983 to 1990. In 1985, Diak noticed a deduction for pensions on the 1984 DCK tax return; when he inquired, Knox told him that the deduction did not reflect a pension, but only compensation for Dwyer.

In 1990, Diak made a formal demand for benefits. DCK responded that it had no pension plan. In 1991, Diak brought suit alleging that DCK, Knox and Dwyer breached their fiduciary duties under ERISA, and seeking clarification of the terms of the plan and recovery of benefits. The district court denied Diak's motion to compel discovery of Dwyer's tax returns for 1984 to 1991. The parties filed cross-motions for summary judgment, agreeing that there were no disputed issues of fact. DCK argued that it was entitled to relief as a matter of law because DCK never had a pension plan covered by ERISA; or if it did, Diak was not a participant in the plan; and that in any event Diak's claims were time-barred. The district court granted DCK's motion for summary judgment, finding DCK had not established a pension plan. We review the district court's grant of summary judgment *de novo.*

## II.

ERISA imposes numerous fiduciary duties on employers in connection with pension plans. Employers are required to establish plans in writing, 29 U.S.C. § 1102(1), create a fund or trust for benefit payments, 29 U.S.C. § 1103(a), and maintain various records. 29 U.S.C. § 1059. However, fiduciary duties arise only if there is a pension plan as defined by ERISA. The Act defines a pension plan as any plan, fund or program established or maintained by an employer that by its express terms or as a result of surrounding circumstances provides retirement income to employees. 29 U.S.C. § 1002(2). A plan need not be in writing to be covered by ERISA so long as the plan is a reality, meaning something more than a mere decision to extend benefits. *James v. National Business Systems, Inc.,* 924 F.2d 718, 719 (7th Cir.1991); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 739 (7th Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982). Rather, we look to whether the decision "constituted an expressed intention by the employer to provide benefits on a regular and long-term basis." *Wickman v. Northwestern Nat'l Life Ins. Co.,* 908 F.2d 1077, 1083 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). DCK's decision to extend benefits to certain employees does not compel the conclusion that it had established a pension plan. "A mere allegation that an employer or employee organization ultimately decided to provide an employee [pension] benefits is not enough to invoke ERISA's coverage." *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1504 (9th Cir.1985); *Pritchard v. Rainfair, Inc.,* 945 F.2d 185 (7th Cir.1991) (plaintiff's belief he would receive health benefits and company's extension of health benefits to two other retirees did not establish a plan); *Harris v. Arkansas Book Co.,* 794 F.2d 358, 360 (8th Cir.1986) (worker suddenly fired after 49 years of service; company's promise of a pension and payment of benefits to other retiree did not establish a plan).

In *Donovan,* the Eleventh Circuit set out the prevailing test for determining whether a

"plan" has been established within the meaning of ERISA:

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

688 F.2d at 1373. *See also Ed Miniat,* 805 F.2d at 739; *Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992); *Elmore v. Cone Mills Corp.,* 6 F.3d 1028, 1035 (4th Cir.1993); *Landry v. Air Line Pilots Assoc. Int'l,* 901 F.2d 404, 415 (5th Cir.1990); *Brown v. Ampco–Pittsburgh Corp.,* 876 F.2d 546, 551 (6th Cir.1989); *accord Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987).

Applying the *Donovan* criteria, the district court found that Diak's claim foundered at the first step—ascertaining the benefits due under DCK's "plan." Dwyer testified that pension payments were determined on an ad hoc basis in consultation with Knox. Each of the individuals who received pensions received different packages, ranging from $75/month for Schaffer to $2500/month for Dwyer. Wiley received only health benefits (a welfare benefit rather than a pension). It is difficult to divine a formula at work in this distribution of payments. Diak's "expert" witness opined that DCK had a pension plan that guaranteed $2500/month to retired officers of the corporation (like Dwyer and Diak) and $100/month to other employees. But this fails to explain all of the payments—Dwyer received nothing at first, eventually received $1000/month, and did not receive $2500/month until 1989. Moreover, Schaffer and Wiley received less than $100/month, and numerous other employees who left the company received nothing.

It would also be difficult to ascertain the appropriate amount of benefits by years of service. Schaffer's 16 years of service netted him $75/month; Chellist's 36 years gave her $100/month; Wiley had worked only 5 years, and received only health benefits. Knox's affidavit indicates that at least two other employees worked for at least 10 years (Fred Siegel and Patricia Costello Thoman) but received nothing. Even if we were to accept Diak's argument that pensions were commensurate with years of service, Diak, who served 12 years at DCK, would be entitled to something less than $75/month.

■ Obviously, a plaintiff need not show the exact dollar amount she would expect to receive in benefits. However, there must be some evidence in the record from which the court can ascertain the benefits due under a plan. In all of the authorities Diak cites, the amount of benefits due or the method of calculating benefits was clear on the face of the record—the only question was whether the plan had been adopted. *Hollingshead v. Burford Equipment Co.,* 747 F.Supp. 1421 (M.D.Ala.1990) (board minutes establishing pension plan listed schedule of benefits commensurate with years of service); *James v. National Business Systems,* 924 F.2d at 719 (plaintiff had drafted proposed payment schedule); *Moeller v. Bertrang,* 801 F.Supp. 291 (D.S.D.1992) (undisputed that all employees working five years would receive a lump sum at retirement at age 62 of $1000 for each year of service). In this case, DCK's conduct does not indicate that DCK had established a plan with ascertainable benefits.

Moreover, we cannot ascertain the intended class of beneficiaries of the alleged DCK plan. Diak claims that all DCK retirees are beneficiaries; DCK argues that at most, benefits were extended to retirees from the DCK Partnership. DCK's position is bolstered by the fact that it has never paid benefits to retirees of the corporation. But given the small size of the sample (four pensions) and absence of extrinsic evidence, we cannot determine which description is accurate, and therefore cannot ascertain the intended beneficiaries.

The district court held that the third *Donovan* criterion—that the source of financing be ascertainable—could not be satisfied where, as here, the pensions are paid from general revenues rather than a separate trust. Of course, ERISA requires employers to fund pensions by a trust, 29 U.S.C. § 1103, and the existence of such a trust may be evidence that a plan exists. But "it is equally true that an employer's failure to meet an

ERISA requirement does not exempt the plan from ERISA coverage." *Williams v. Wright,* 927 F.2d 1540, 1544 (11th Cir.1991); *Scott v. Gulf Oil Corp.,* 754 F.2d at 1503. "An employer ... should not be able to evade the requirements of the statute merely by paying ... benefits out of general assets." *Fort Halifax Packing Co.,* 482 U.S. at 18, 107 S.Ct. at 2221. We therefore conclude that DCK's payment of benefits out of general funds satisfies the requirement of an ascertainable source of funding. *See also Williams,* 927 F.2d at 1544.

Lastly, we note that the procedures for obtaining benefits are unclear. Diak claims that the only procedure is resignation. But Dwyer did not begin receiving a pension until two years after resignation, and he testified that the pension was provided after he consulted with Knox. Moreover, there is no evidence as to how Schaffer, Chellist and Wiley "applied" for benefits or why other retirees did not receive benefits.

Under these criteria, DCK's provision of pensions to certain employees did not constitute a "plan" within the meaning of ERISA. Few DCK retirees received any benefits, and the benefits paid were clearly not calculated according to an established plan, but rather represented ad hoc arrangements with each individual. With only this evidence, we could not begin to fashion appropriate relief for Diak, since we do not know whether he was the type of employee DCK intended to cover, or what benefits are due. We also note that there was no evidence that Diak expected a pension; rather, he was expressly told in 1985, just before he "retired," that DCK had no pension plan.

However, there is a glaring inconsistency between DCK's insistence that it never established a pension plan and its yearly deductions for pension payments on its corporate tax returns. DCK deducted pension payments from its corporate tax returns (the record is unclear as to which years this actually occurred), and provided pension recipients with W2-P forms indicating the receipt of pension benefits. DCK also did not deduct Social Security taxes from payments to Dwyer. Thus for tax purposes, it would appear that DCK acted as though it had an ERISA-qualified plan. But the record shows that DCK did not establish an informal ERISA plan, and the tax returns do not require a different conclusion. We are not in a position to consider the tax consequences of DCK's seemingly divergent approaches, but nonetheless hold that DCK did not establish a pension plan under ERISA. We therefore do not need to consider whether Diak was a participant in a plan, or whether the claim was filed within the statute of limitations.

### III.

Diak requested discovery of Dwyer's tax returns from 1984 to 1991. Dwyer provided redacted returns, revealing only the amount of money he received as pensions. Diak moved to compel production of the entire returns, arguing that he needed to know whether Dwyer had received any other income from DCK. The district court inspected the full returns *in camera* and concluded that the redacted information was immaterial to the pensions question. All of the information relevant to the pension claim was turned over to Diak or available from DCK's tax returns (such as whether Social Security was deducted from Dwyer's pension); we do not find that the district court abused its discretion in denying the motion to compel.

The decision of the district court is AF-FIRMED.